**Leslie Ray MAIXNER, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 045–84.

Court of Criminal Appeals of Texas, En Banc.

June 22, 1988.

Troy C. Hurley (Court-appointed), Temple, for appellant.

Arthur C. Eads, Dist. Atty., and James T. Russell, Asst. Dist. Atty., Belton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

McCORMICK, Judge.

Appellant was convicted of murder and sentenced to forty-five years' confinement.

The Beaumont Court of Appeals reversed appellant's conviction in a published opinion and ordered the cause remanded for a new trial. *Maixner v. State* (No. 09–83–092Cr, delivered Nov. 30, 1983, Tex.App.Beaumont). The Court of Appeals found that because the arrest of appellant was unlawful the confessions he made thereafter were inadmissible at his trial. The State has petitioned this Court to review this holding. We reverse the Court of Appeals.

On September 9, 1980, at approximately 5:30 p.m., Dennis Lewis, a detective captain in the Killeen police department, spoke to a Gregory Hogle in the detention area of the police department. Hogle had been arrested for assault and unlawfully carrying a weapon. Hogle told the officer that he knew the location of the body of a murder victim. He also stated that he was acquainted with the person who had committed the murder. Shortly after this conversation, Captain Lewis, accompanied by other members of the Killeen police department, escorted Hogle to a location in Bell County.[1] Several members of the local television news media learned of the investigation and arrived at the location to prepare news reports of the event. At this location, the partially clad remains of a nineteen year old woman were found.

Hogle told Captain Lewis that a man nicknamed "Shorty" had killed the young woman and that his last name was Maxon or Mason or perhaps Maxner. He also described this person as being a short, slight white male in his late twenties or early thirties. Later that evening, at approximately 8:00 or 8:30 p.m., Hogle further informed the officer that the person he described frequented a night club in Harker Heights called The Western Club. Hogle also stated that the man's name

---

1. Because the body of the young woman was located in a portion of Bell County which was outside the city limits, the case was properly within the jurisdiction of the Bell County Sheriff's Department. Captain Lewis notified the Bell County sheriff's office shortly after he and his fellow officers discovered it. Shortly thereafter, members of the Bell County sheriff's department arrived on the scene. From this point on the investigation became a joint Killeen police department and Bell County sheriff's office investigation. All references to "officers" will refer to both Killeen police officers and/or Bell County sheriff's deputies and investigators unless otherwise noted.

might be Maixner rather than Maxnor or any of the other names he had mentioned. Furthermore, Hogle informed the officers that "Shorty" had been arrested in the past for minor alcohol related offenses. Hogle informed the officers that these arrests had been made by the Harker Heights police department.

At sometime around 9:00 p.m., a Bell County sheriff's officer checked with the Harker Heights police department in an effort to determine if they knew a person with the nickname "Shorty" who answered the description Hogle had given them. The officers in Harker Heights said they were familiar with a man named "Shorty" who did in fact answer the description given by Hogle. They further informed the Killeen officers that "Shorty" was a frequent customer of The Western Club. As of 9:25 that evening, Hogle had signed a written statement which implicated "Shorty" in the commission of the crime.

Meanwhile, the Bell County officer had requested assistance from the Harker Heights police department. Officer Avery of the Harker Heights police department, acting upon the request of the Bell County office, sent an officer to the Western Club with instructions to arrest appellant without a warrant and to transport him to the Killeen police department. This occurred at sometime between 9:00 and 9:45 p.m. The Killeen officers stated that they feared appellant would watch the 10:00 o'clock news and learn that the victim's body had been discovered. The officers stated that they were concerned that he would attempt to escape if he did in fact see such a report on the evening news. It was for this reason that they felt there was not enough time to obtain a warrant before arresting appellant. Accordingly, appellant was arrested.

Immediately upon arrival at the Killeen police station, appellant was informed of his rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (Hereafter, this case and the procedural warnings will be referred to as *Miranda*, and *Miranda* rights or warnings, respectively.) Appellant was informed of Hogle's

statements and expressed a desire to talk about the incident in an effort to, as quoted by Lewis, "get this [matter] straight." Lewis then asked him if he was voluntarily waiving his rights as they were explained to him earlier. Appellant stated he did so wish to waive his Fifth Amendment rights.

Sometime during the initial contact between appellant and the officers, two assistant district attorneys for Bell County were contacted by police officers. They arrived at the station and engaged Officer Lewis and other officers in a conversation concerning the events of the evening. While the record is not clear as to the substance of that discussion, Lewis broke off his discussion with appellant without having obtained either orally or in writing any particularly incriminating information. At that time he telephoned another assistant district attorney, Jim Lightner, and discussed the case with him. Testimony shows that Lightner recommended that the officers release appellant from custody and allow him to leave. It is apparent that Lightner was unsure of the legality of the arrest. In any event, he counseled the officer to inform appellant that he was free to leave. He further recommended that in no event should appellant be questioned further unless he signed a statement saying he was appearing voluntarily and voluntarily waiving his rights. The officers did as Lightner requested.

Captain Lewis testified that he informed appellant that he (the appellant) was free to leave. According to Lewis, however, appellant expressed a desire to continue talking to the officers and declined the invitation to leave the station. After Lewis explained to appellant that he was free to go and after the appellant expressed a desire to continue talking to the officers, Lewis asked him to sign a form marked "voluntary appearance for investigation purposes only." The form contains a list of the *Miranda* warnings, separately numbered with a space beside each right or warning for the interviewee to initial.

The officer also testified that he spent approximately ten minutes (from 10:36 to 10:46) explaining to appellant the *Miranda*

rights which appeared on the form. Appellant acknowledged that he understood his rights and was willingly waiving them. Indeed, appellant initialed each space corresponding to the enumerated rights which appear on the form, and signed the form. Captain Lewis testified that he had fully intended to allow appellant to leave if he had expressed a desire to do so. Assistant district attorney Lightner testified that he was completely serious in advising the officers to inform appellant that he was free to leave. Another assistant district attorney, Steve Morris, was present during much of the questioning. His testimony indicates that he viewed appellant's release as a genuine release and fully intended to allow him to leave.

At approximately 10:46, only a few minutes after his release from custody by Captain Lewis, appellant signed the waiver form and began a discussion of the case with the officer and Mr. Morris. Appellant subsequently signed two written statements, the first at 11:44 p.m., September 9, 1980, and the second at 12:53 a.m., September 10, 1980. These statements admitted involvement in the murder for which appellant stood trial.

Shortly after making the statements, a justice of the peace was brought to the station house and an affidavit and complaint for appellant's arrest were prepared and presented to him. An arrest warrant was issued and appellant was arrested and immediately arraigned. Immediately after the arraignment, a law enforcement officer asked appellant if the belt he was wearing was used by him to strangle the victim. Appellant answered that it was and surrendered possession of it to the officer. Later that day, appellant appeared before the Bell County grand jury and further implicated himself in the crime for which he was charged. At this proceeding, appellant was again informed of his rights and was allowed to retire to a private room to consider whether or not he wanted to obtain counsel before speaking further to the grand jury. Appellant nonetheless chose to continue his testimony. An indictment was subsequently returned.

On appeal, appellant argued, inter alia, that his arrest could not be justified under the terms of Article 14.04, V.A.C.C.P. The Court of Appeals found appellant's argument persuasive and reversed and remanded the cause on this point of error.

## I.

Articles 14.01 through 14.04, V.A.C.C.P., prescribe the situation in which a peace officer may arrest without a warrant.[2] The State relies upon Article 14.04, supra, to justify the warrantless arrest in this case. That Article reads as follows:

"Where it has been shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused."

The sine qua non of a lawful arrest under the authority of Article 14.04, supra, is some showing that the appellant is about to escape. Article 14.04, supra; *Bain v. State*, 677 S.W.2d 51 (Tex.Cr.App.1984); *Hardison v. State*, 597 S.W.2d 355 (Tex.Cr. App.1980); *Honeycutt v. State*, 499 S.W.2d 662 (Tex.Cr.App.1973). The officers testified that they did not know during much of the evening whether appellant would enter a place where a television would be present or that appellant was even likely to watch the evening news. It is true that Article 14.04, supra, does not require that the suspect was *in fact* about to escape or that there was *in fact* no time to procure a warrant. The terms of Article 14.04, supra, however, do require a showing that the officers were acting upon satisfactory proof from a credible person that the escape was imminent such that there was no time to obtain a warrant. *Fry v. State*, 639 S.W.2d 463 (Tex.Cr.App.1982). The Court of Appeals was correct on this point.

2. See also, Article 18.16, V.A.C.C.P., (Preventing Consequences of Theft).

155

## II.

Simply determining that appellant's initial arrest was illegal under the laws of this State, however, does not end our inquiry. Explaining the proper analysis to be conducted in these types of cases, Presiding Judge Onion, in *Self v. State*, 709 S.W.2d 662 (Tex.Cr.App.1986), wrote:

"What analysis are we to follow to determine whether appellant's confession was the fruit of his illegal warrantless arrest in violation of Chapter 14 of the Texas Code of Criminal Procedure? Since there were no federal constitutional violations here involved, we are not bound to follow the analysis in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). See *Duncan v. State*, 639 S.W.2d 314, 318 (Tex.Cr.App. 1982). Only recently, however, in *Bell v. State*, 707 S.W.2d 52 (Tex.Cr.App.1986) [see now 724 S.W.2d 780], this Court adopted the *Brown* analysis or test to be applied to violations of Article 14.01 through 14.04, supra, and that test will be applied here." 709 S.W.2d at 665.

The Supreme Court of the United States in *Brown v. Illinois*, 442 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), wrote:

"Thus, even if the statements *in this* case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for *the causal* chain, between the illegal arrest and the statements made subsequent thereto, to be broken ... *requires* not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be sufficiently an act of free will to purge the primary taint. *Wong Sun* [*v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)] thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment."

Although the Supreme Court declined to promulgate a sweeping "totality of the circumstances test" to resolve this issue, the *Brown* Court did cite four relevant factors to be considered in determining whether the causal chain between the illegal arrest

and the statement is sufficiently broken to allow a determination that the statement was not the product of an illegal arrest. We adopted these factors in *Self.* These four factors are:

(1) whether or not the accused received *Miranda* warnings;

(2) the temporal proximity of the arrest and the confession;

(3) the presence of intervening circumstances; and

(4) the purpose and flagrancy of the official misconduct.

### MIRANDA WARNINGS

In the case before us, the record reflects that appellant received *Miranda* warnings on no less than three occasions prior to making his incriminating statements. He was warned of his *Miranda* rights immediately after being brought into the Killeen police station by the Harker Heights officers. He was warned of his rights a second time immediately after he had been informed he was free to leave the police station. He was informed of his rights a third time immediately prior to the beginning of the interrogation which produced his incriminating statements.

On the second occasion he signed a form, marked "voluntary appearance for investigation purposes only." Appellant first signed an acknowledgement that he was appearing voluntarily and that he was not "under arrest or detention" and that he understood he could "break off any interview and leave voluntarily." Furthermore, appellant then signed his name to a further statement appearing on the same instrument which affirmed that he understood his constitutional (*Miranda*) rights as set forth above his second signature. These rights are enumerated and beside each of the six warnings is a space for the appellant to put his initials as a way of showing he read and understood each right. Each of these blanks was initialed by appellant. It is uncontroverted that appellant was read his *Miranda* rights. Furthermore, testimony from several officers and assistant district attorneys indicates that the officer who took this statement (Captain

Lewis) carefully explained the nature and character of each right waived.

While it is true that *Miranda* warnings in and of themselves are not enough to attenuate the taint of an illegal arrest they are an important factor. *Brown v. Illinois, supra; Townsley v. State, supra.* In the case before us, it is clear and undisputed that appellant received *Miranda* warnings several times before he gave his initial confession.

## TEMPORAL PROXIMITY

As for the question of temporal proximity, it seems that the arrest took place at approximately 9:30 p.m. on the evening of September 9, 1980. Appellant completed his first confession at 11:44 p.m. on September 9, 1980. The evidence also supports an inference that appellant began his statement at approximately 11:05 p.m. on September 9. Therefore, there is clearly a close temporal proximity (perhaps less than two hours) between the time of arrest and the time the incriminating statement was made. This is approximately the same amount of time that had lapsed between the arrest and the confession in *Self.* We noted in *Self,* however, that temporal proximity is an "ambiguous" factor and is "generally not a strong factor per se." 709 S.W.2d at 666. This court's observations in *Self* are sound, as one United States Supreme Court Justice has noted that even an immediate post-arrest confession may have been motivated by a prearrest event. *Dunaway v. New York,* 442 U.S. 200, 221, 99 S.Ct. 2248, 2261, 60 L.Ed.2d 824, 841 (1979) (Stevens, J., concurring).

Nevertheless, there was a very short period of time between the initial arrest and the first confession given. If no intervening circumstances were present in this case, this temporal proximity might suggest that appellant had very little time to reflect before speaking.

## INTERVENING CIRCUMSTANCES

In this case, however, an extremely significant intervening factor is present. Appellant had been released from custody and had been informed he was free to leave. He nonetheless chose to remain, stating to one witness that he "wanted to get everything out in the open." According to another witness present, appellant, after having had his *Miranda* rights given to him in great detail, expressed a desire to give a statement.

The uncontroverted testimony shows that appellant was released from custody prior to making his statements. Appellant insists that this release from custody was a sham release, or a pretext of release. The clear and uncontroverted testimony of the officer and assistant district attorneys involved shows that they were sincere and would in no way impede appellant's departure from the police station. To be sure, appellant was still a suspect in a major and very serious crime. The officials involved candidly admit that they intended to proceed with their investigation. They furthermore stated honestly that they believed they had the requisite probable cause to obtain a warrant for a second arrest and that they intended to review the events of the evening to ascertain this.

This in no way, however, changes the fact that appellant was released from actual custody. He was free to leave, free to obtain a lawyer and free to seek whatever counsel and pursue whatever course of action a person in his position would logically embark upon. The actual release from custody is a very significant intervening circumstance. Appellant's insistence on remaining at the station was an entirely volitional act. This course of conduct was pursued in the face of repeated and detailed warnings that he had a right to remain silent and to seek counsel. Appellant's release from custody and insistence on giving a statement constitutes significant intervening circumstances.

## OFFICIAL MISCONDUCT

Finally, we must look to the purpose and flagrancy of the official misconduct. In this case the police officers involved have stated that they did not initially seek a warrant because it was their subjective belief that the possibility existed that appellant would attempt to escape before

they could successfully obtain or execute the warrant. As it turns out, the officers' assessment of the situation was not accurate and the circumstances did not justify a warrantless arrest under Article 14.04, supra. It is difficult, however, for this Court to characterize the mistake of the officers as purposeful or flagrant misconduct. The officers knew that a brutal murder had been committed and that the person who committed the crime was still at large. In responding to this emergency, they did, in fact, make an error in judgment but the official misconduct attending the initial arrest cannot be characterized as either flagrant or purposeful.

When the officers had custody of appellant, they obtained advice from the district attorney's office on how to conduct the investigation. They were informed that they had improperly arrested appellant and should release him. They immediately did so and carefully informed appellant of the rights he was waiving. Appellant nonetheless chose to remain at the station and to continue talking to the police officers. According to all of the evidence, appellant chose to make written statements implicating himself in a very serious crime after repeated warnings that he had a right to remain silent and to obtain counsel. There is no evidence that appellant was in any way physically mistreated, threatened or verbally abused. There is testimony that he was allowed refreshments and encouraged to think carefully about his statements.

The purpose of the police conduct was entirely legitimate. The actions of the officers were not deliberately calculated to deny appellant the full benefit and free exercise of his rights.

■ Although there may have been a violation of the statutes, appellant's arrest was not violative of the Federal Constitution. The arresting officers had sufficient information to establish probable cause to make the arrest and appellant's arrest was made in a public place. See, *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). See also, *Maloy v. State*, 582 S.W.2d 125, 127 (Tex.Cr.App.

1979). The arrest here was warrantless but it was with probable cause. We agree with the Court of Appeals that the conduct of the officers was not in accordance with state law, and should not be condoned, but under the circumstances of this case, we note that the officers' conduct was not flagrant. The case of *Brown v. Illinois*, supra, is an example of flagrant police conduct. The arrest there was made solely on the basis of an unsubstantiated tip which identified Brown only as an acquaintance of a murder victim. He was not a suspect at the time of his arrest. Brown's arrest was made without probable cause and without a warrant. The Supreme Court observed that "the manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright and confusion." *Brown v. Illinois*, supra, 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428.

Here, as in *Self*, appellant's arrest had no "quality of purposefulness;" it was not an "expedition for evidence" undertaken "in the hope that something might turn up." *Brown v. Illinois*, supra, 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428; *Self v. State*, supra, 709 S.W.2d at 667. Thus, the fourth factor of *Brown* analysis must be decided adversely to appellant's position.

This Court has determined that this fourth factor of the *Brown* analysis is to be given considerable weight in determining whether a confession can be said to be the product of an illegal arrest. "Given the deterrent purpose of the exclusionary rule of the Fourth Amendment and of Article 38.23, V.A.C.C.P., the fourth factor, the purpose and flagrancy of the police conduct, may be the most important factor of the four...." *Self v. State*, supra, at 668.

■ After assessing the relevant factors, we conclude that appellant's statements were not obtained by the exploitation of the illegal arrest. We have reviewed all the relevant circumstances of this case and we must find that intervening circumstances clearly broke the causal connection between appellant's statements and his arrest. Thus, appellant's statements were sufficiently an act of free will that

the primary taint of the initial illegal arrest has been purged. *Self v. State,* supra, 709 S.W.2d at 668.

Having so concluded that appellant's statements were not the product of his illegal arrest, we also find that the item of evidence (the belt) was not obtained by the exploitation of the illegal arrest.

We reverse the judgment of the Court of Appeals and remand the case to the Court of Appeals for consideration of appellant's remaining points of error.

CLINTON and TEAGUE, JJ., concur in the result.