

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. AP-75,677

**RICHARD LEE TABLER, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 57,382 IN THE 264TH DISTRICT COURT BELL COUNTY

**JOHNSON, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

In April 2007, appellant was convicted of capital murder. TEX. PENAL CODE § 19.03(a)(7)(A). Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial court sentenced appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is mandatory. Art. 37.071, § 2(h). After reviewing

---

[1] Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

appellant's six points of error, we find them to be without merit. Accordingly, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

Appellant does not challenge the sufficiency of the evidence to support his conviction. Therefore, we set out only a brief summary of the facts. Mohamed-Amine Rahmouni managed a topless bar called Teazers, where appellant worked until he and Rahmouni had a conflict. Rahmouni allegedly told appellant that he could have appellant's family wiped out for ten dollars.

Appellant decided on November 18, 2004, that he would kill Rahmouni after Thanksgiving. In preparation for killing Rahmouni, appellant borrowed a 9-millimeter gun, a camcorder, and a pickup truck. Then, on the night of November 25, 2004, which was Thanksgiving Day, appellant called Rahmouni with an offer to sell him cheap stereo equipment and told him they would meet in the parking lot of a local business. Haitham Zayed drove Rahmouni to the parking lot to meet appellant around 2:00 a.m. on Friday morning. Appellant and his friend Timothy Payne were waiting for them in the truck that appellant had borrowed. As soon as Zayed's car stopped, appellant shot Zayed and then Rahmouni. He then exited the truck and pulled both men from the car. He saw that Rahmouni was still alive, so he shot him a second time. He had Payne videotape part of the shooting. Later that day, the videotape was destroyed after appellant showed it to a friend. Appellant took a wallet and a black bag that he found inside the car. On the following Sunday night, appellant was arrested, and in the early morning hours of Monday, November 29, he confessed to the shootings.

At punishment, the State introduced evidence that appellant also confessed to murdering Amanda Barfield and Tiffany Dotson, who were dancers at Teazers, because he believed that they

were telling people that he had killed Rahmouni and Zayed.

CONSTITUTIONALITY OF IMPOSING THE DEATH PENALTY

In his first point of error, appellant asserts that his sentence of death is unconstitutional because the Eighth and Fourteenth Amendments of the United States Constitution preclude the death penalty for the mentally ill. He urges that the constitutional protection he seeks is a logical extension of the United States Supreme Court's decisions in *Roper v. Simmons* and *Atkins v. Virginia,* in which the Court found that imposing capital punishment on juvenile and mentally retarded offenders violates the Constitution. *Roper,* 543 U.S. 551 (2005); *Atkins,* 536 U.S. 304 (2002). Appellant asserts that evolving standards of decency dictate that the death penalty is unconstitutional as applied to people who have a lifelong and *bona fide* history of serious mental illness that diminishes their culpability.

Appellant acknowledges that the Supreme Court has not decided that mentally ill offenders are categorically less culpable than the average criminal. Nevertheless, as evidence of a growing public consensus against executing the mentally ill, appellant notes that the Texas Task Force for Indigent Defendants has provided funding for a special mental-health public defender for Travis County. He explains that Travis County has identified individuals with major mental-health problems, such as schizophrenia, bipolar disorder, and major depression, as needing special consideration in the criminal-justice system. Appellant urges that the creation of the special public-defender position constitutes an implicit recognition of mentally ill offenders as a class of persons with diminished culpability, such that they should not be punished to the same extent as other offenders. However, we do not agree with appellant's conclusion that the provision of a special public defender is equivalent to a categorical diminished-culpability determination. Moreover,

appellant does not demonstrate that there is a trend among state legislatures to categorically prohibit the imposition of capital punishment against mentally ill offenders. *See Atkins,* 536 U.S. at 312 (quoting *Penry v. Lynaugh,* 492 U.S. 302, 331 (1989)) ("the 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures'"). Nor has the Texas Legislature taken such a step.

We have observed in the past that there is no authority from the Supreme Court or this Court suggesting that mental illness that is a "contributing factor" in the defendant's actions or that caused some impairment or some diminished capacity, is enough to render one exempt from execution under the Eighth Amendment. *See, e.g., Battaglia v. State,* No. AP-74,348, 2005 WL 1208949 at *10 & n.39 (Tex. Crim. App. May 18, 2005) (not designated for publication) (citing *Colburn v. State,* 966 S.W.2d 511 (Tex. Crim. App. 1998)). In *Battaglia,* we declined to extend the federal constitutional proscription against execution of the insane and mentally retarded to the greater category of mentally ill defendants. *Id.* We adopt our holding in *Battaglia* today. Point of error one is overruled.

ERROR IN CLOSING ARGUMENT

In point of error three, appellant asserts that the prosecutor's closing argument at punishment violated *Tennard v. Dretke,* 542 U.S. 274 (2004), and was so egregious as to deny him due process, due course of law, and a fair trial. However, because appellant failed to object, he forfeited this complaint on appeal. *See Threadgill v. State,* 146 S.W.3d 654, 670 (Tex. Crim. App. 2004). Point of error three is overruled.

INEFFECTIVE ASSISTANCE OF COUNSEL AT CLOSING ARGUMENT

In point of error two, appellant asserts that trial counsel was ineffective when he failed to

object to the prosecutor's closing argument at the punishment phase that there had to be a nexus between the mitigating evidence and the offense. He asserts that this argument violated *Tennard,* 542 U.S. 274.

To support a claim of ineffective assistance of counsel, appellant must establish that trial counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability the result of the proceeding would have been different but for counsel's unprofessional errors. *See Narvaiz v. State,* 840 S.W.2d 415, 434 (Tex. Crim. App. 1992) (citing *Strickland v. Washington,* 466 U.S. 668, 694 (1984)). "Appellate review of trial counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Garza v. State,* 213 S.W.3d 338, 348 (Tex. Crim. App. 2007). "If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Id.*

Here, much of the prosecutor's argument was not an improper "nexus" argument, but was instead a permissible argument that the evidence of appellant's background did not reduce his blameworthiness. *See, e.g., Williams v. State,* 270 S.W.3d 112, 138 (Tex. Crim. App. 2008)(citing *Hawkins v. State,* 135 S.W.3d 72, 85-87 (Tex. Crim. App. 2004)(Womack, J., concurring)), and indicating that jury argument conveying that appellant's troubled background did not lessen his moral blameworthiness was permissible). However, the prosecutor arguably made an improper "nexus" comment when he stated that evidence that appellant had been abused and neglected as a child was not relevant in mitigation because his offense had not involved acting out against his abusive and neglectful parents. Appellant asserts that this comment ran afoul of the Supreme

Court's mandate that a jury must be able to consider any evidence that it could reasonably find warrants a sentence less than death, without regard to whether the defendant has established a nexus between such evidence and his crime. *See Tennard,* 542 U.S. at 285 (quoting *McKoy v. North Carolina,* 494 U.S. 433, 441 (1990)).

Without a fully developed record, we can only speculate as to counsel's strategy. *Mitchell v. State,* 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). Perhaps counsel did not want to call attention to the improper comment by objecting. Perhaps counsel believed that his own argument and the trial court's instructions sufficiently cured any error. Trial counsel broadly argued that appellant was abnormal and so he could not be held to the same standards as a normal person. Counsel urged that, based on the mitigating evidence presented at trial, appellant should not be held to the same level of accountability as "the rest of us." Counsel asserted that the evidence did not have to be connected to the offense in order to be mitigating. Additionally, the mitigation instruction provided by the trial court expressly commanded the jury to consider all of the evidence, including evidence of the defendant's background and character.[2]

---

[2] The jury was instructed:

> In deliberating on Issue No. 1 and Issue No. 2, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

As to Issue No. 2, the mitigation issue, the verdict form read:

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances that a sentence of life imprisonment rather than a death sentence should be imposed?

> You are instructed that in answering this issue, you shall answer the issue "Yes" or "No."

(continued...)

Because counsel's conduct could have been grounded in legitimate trial strategy, we will not presume on appeal that counsel's performance was deficient. Point of error two is overruled.

JURY INSTRUCTIONS ON DEFENSES AND LESSER-INCLUDED OFFENSE

In his fourth point of error, appellant asserts that the trial court erred at the guilt phase when it denied his request for jury instructions on self-defense, defense of a third person, and the lesser-included offense of murder. He reasons that if the jury had found that he was justified by self-defense or defense of a third person when he killed Rahmouni, then he would not have been found guilty of capital murder by murdering more than one person in the same transaction. Instead, he would have been convicted only of the murder of Zayed. *See, e.g., Moore v. State,* 969 S.W.2d 4, 12 (Tex. Crim. App. 1998) (in capital-murder prosecution under Section 19.03(a)(7)(A), if one of the two killings committed during the same criminal transaction had been justified, then appellant would have been convicted of only one murder ).

Appellant asserts that he was entitled to these jury instructions because there was evidence that he was justified in killing Rahmouni. He points to his confession, in which he stated that, about a week before the murders, Rahmouni had told him, while waving a ten-dollar bill in his face, that he could wipe out appellant's whole family for ten dollars. Appellant asserts that this statement constituted a threat to him and his family, such that a rational jury could have found that he killed Rahmouni in self-defense or defense of a third person.

To justify the use of deadly force against another, an actor must first show that he reasonably

---

[2](...continued)

> You may not answer the issue "No" unless the jury unanimously agree[s], and you may not answer the issue "Yes" unless ten or more jurors agree. The jury need not agree on what particular evidence supports an affirmative finding in this case. The jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

believed the force was immediately necessary to protect himself or a third person against another's use or attempted use of unlawful deadly force. TEX. PENAL CODE §§ 9.31(a), 9.32(a), 9.33 (Vernon Supp. 2002). The use of force against another is not justified in response to verbal provocation alone. TEX. PENAL CODE § 9.31(b)(1). However, a defendant does not have to prove that the other person was actually using or attempting to use unlawful deadly force; he is justified in using force to defend against danger as he reasonably apprehends it. *Hamel v. State,* 916 S.W.2d 491, 494 (Tex. Crim. App. 1996).

Here, appellant could not have reasonably believed that deadly force was immediately necessary to protect himself or his family from the use of unlawful deadly force. It is doubtful that Rahmouni's statement that he "could" wipe out appellant's family amounted even to verbal provocation. In addition, the verbal confrontation had ended several days before appellant lured Rahmouni to a deserted parking lot with the intention of killing him. Under these circumstances, the trial court did not err in refusing appellant's requested instructions. Point of error four is overruled.

## ADMISSIBILITY OF APPELLANT'S STATEMENTS

In point of error five, appellant asserts that the trial court erred in failing to suppress appellant's statements because they were the fruits of his illegal arrest, in violation of the Fourth Amendment of the United States Constitution.[3] In reviewing a trial court's ruling on a motion to suppress, we give almost total deference to a trial court's determination of historical facts and review

---

[3] Appellant does not specifically complain that the admission of his statements violated Art. 38.23, but he does argue that his statements should have been suppressed because they resulted from, and were tainted by, an illegal arrest. In the interest of justice, we will consider the admissibility of appellant's statements under Art. 38.23. *See, e.g., Bell v. State,* 724 S.W.2d 780, 786 (Tex. Crim. App. 1986) (applying both Fourth Amendment exclusionary rule and Art. 38.23 in considering appellant's complaint that his statement should have been suppressed because it resulted from an illegal arrest).

*de novo* the court's application of the law. *Guevara v. State,* 97 S.W.3d 579, 583 (Tex. Crim. App. 2003). We will uphold the trial court's ruling if it is supported by the record and correct under some theory of law applicable to the case. *St. George v. State,* 237 S.W.3d 720, 725 (Tex. Crim. App. 2007) (citing *Armendariz v. State,* 123 S.W.3d 401, 404 (Tex. Crim. App. 2003)).

Here, the trial court's findings of fact are supported by the record. Killeen Police Officer Robert Clemons and Bell County Sheriff's Department Investigator Timothy Steglich testified at the pre-trial suppression hearing. Clemons testified that toward the beginning of November, appellant had begun "working off" a pending theft case stemming from his purchase of stereo equipment with fraudulent checks. Appellant signed a contract in which he agreed to cooperate as a confidential informant in a drug investigation in exchange for nonprosecution of the theft.[4] An investigator in the Bell County District Attorney's Office introduced appellant to Clemons. Appellant worked with Clemons on a controlled drug buy on November 4, 2004.

In the course of investigating the murders of Rahmouni and Zayed, the Bell County Sheriff's Department identified appellant as a "person of interest." Around 4:00 p.m. on November 28, 2004, which was the Sunday following Thanksgiving, Steglich, who was leading the murder investigation, contacted Clemons and asked him to speak with appellant about setting up a controlled drug buy. Both Steglich and Clemons understood that the drug buy was just a ruse. They wanted appellant to set up the buy and then go to the police station to meet Clemons so that they could arrest him on his pending theft case and then question him about the murders. Both officers were aware that no arrest warrant had been issued. Steglich had begun working with the district attorney's office on this matter some time before he contacted Clemons. However, he did not obtain an arrest warrant until

---

[4] The precise terms of this contract are not in the record.

about 10:55 p.m. that evening.

Clemons left a voice-mail message with appellant around 4:30 p.m., and appellant returned his call around 7:00 p.m. Appellant agreed to set up the drug buy and meet Clemons at the police station. He set up the buy and called Clemons to say that "Chris" would not be able to obtain the drugs until after 9:00 p.m. Appellant arrived at the police station around 9:15 p.m., and Clemons went through the motions of preparing for the buy. Steglich called in with updates about his progress in obtaining the arrest warrant. In turn, the police officers informed Steglich that appellant was becoming anxious to leave and make the drug buy. At about 9:25 p.m., Steglich instructed Clemons to arrest appellant, despite the fact that Steglich had not yet obtained a warrant.[5]

Clemons testified that appellant was enthusiastic about helping with the drug buy. Clemons did not view appellant's anxiety to leave the police station as a desire to flee; rather, he believed that appellant was anxious to complete the drug buy because it was getting late and his seller would be waiting for him as scheduled. Clemons initially handcuffed appellant incident to frisking and "wiring" him in preparation for the drug buy, and Clemons kept appellant handcuffed after he received instructions to arrest him. Clemons acknowledged that he did not *Mirandize* appellant in connection with his arrest until around 10:05 p.m. *See Miranda v. Arizona,* 384 U.S. 436 (1966).

As soon as appellant was informed he was under arrest for theft, he spontaneously volunteered that he had information about the murders. Appellant indicated that his friend "Tim" had committed the murders and then told him all the details. He said he wanted to talk to someone in the district attorney's office. Clemons testified that appellant was still focused on getting his theft

---

[5] Clemons testified that Steglich told him the warrant had been obtained before he arrested appellant, but he also testified that Steglich told him to arrest appellant without a warrant because he was a flight risk. This inconsistency does not affect our resolution of this claim.

case dropped. Clemons did not interrogate appellant at that time, but appellant kept talking.

Steglich testified that he believed that appellant would flee if Clemons let him leave the police station to complete the drug buy. However, Steglich also testified that he had the impression that appellant was anxious to leave because he wanted to complete the drug buy, not because he wanted to escape. Even without direct evidence that appellant intended to escape, Steglich believed that appellant was "an extreme flight risk" based on his knowledge that appellant had arrests from several states, had moved frequently between states shortly before arriving in Killeen, was not steadily employed, had given two addresses in Killeen as his residence, and "other matters, including a warrant outstanding out of Florida that [Steglich] was unable to confirm." Therefore, when Steglich heard that appellant was becoming anxious to leave, he instructed Clemons to arrest him. Steglich did not begin questioning appellant until after he had obtained the magistrate's signature on the arrest warrant and appellant had been transported to the county jail.

After they had the arrest warrant, both Steglich and Clemons interrogated appellant. Clemons testified that, when they began the interrogation, he recorded it with a digital audio recorder, but the recorder's memory ran out before the first statement was completed and none of the remaining interrogation was recorded. In appellant's first written statement, he stood by his original story that Tim had committed the murders and then told appellant about them. This statement was taken at 12:20 a.m. on November 29. Steglich did not believe that appellant had told them everything because he was being evasive, fidgeting, failing to make eye contact, and focused on leaving the building. Therefore, they interrogated appellant further. Steglich acknowledged that by then he was pressing appellant for information. Appellant took bathroom breaks and drank coffee throughout the interrogation.

After additional questioning, appellant gave a second written statement which, unlike the first statement, included initialed *Miranda* warnings and a signed waiver. In it, appellant admitted that he was present while Tim committed the murders, and he gave consent to search his rooms at two residences as well as the car he had driven to the police department. This statement was taken at 2:20 a.m.

Still not satisfied that appellant had told them the whole story, Steglich and Clemons continued to question appellant. Steglich acknowledged that by then, he was moving in front of appellant, demanding eye contact, and asking appellant if he had ever lost a family member. Appellant became very emotional. Steglich had the impression that appellant realized he had lost control of the interview and was wearing down. However, appellant never said that he did not want to talk, that he wanted a lawyer, or that he wanted to take a break and get some sleep.

Appellant then gave a third written statement, which included *Miranda* warnings and a waiver. In it, appellant said, "I was pushed into a corner by these people and I will now tell the truth about these incidents." He then described how he had planned and executed the murder of Rahmouni, how he had intentionally murdered Zayed, and how he had taken a wallet and a black bag from Zayed's car after the murders. This statement was taken at 5:13 a.m.

After this testimony was complete, counsel argued that all of appellant's statements had to be suppressed because they were the fruit of an illegal arrest under Article 38.23, and no intervening events had removed the taint of the arrest. The prosecutor argued that the statements were admissible because the arrest was legal pursuant to Article 14.04, which provides an exception to the warrant requirement when the arresting officer has satisfactory proof from a credible source that the defendant committed a felony and is about to escape, so that there is no time to procure a

warrant. He also argued that the statements were admissible because Steglich had a warrant in hand by the time he interrogated appellant.

Defense counsel pointed out that law enforcement officials had had probable cause to arrest appellant on the theft case since before he began cooperating as an informant. Once they had probable cause, they could have gotten a warrant at any time in the weeks leading up to appellant's arrest. Counsel also argued that Steglich's testimony did not specify any reason he had to believe that appellant was more of a flight risk on November 28 than he had been before.

### A. Legality of Arrest

"A police officer may arrest an individual without a warrant only if (1) there is probable cause with respect to that individual and (2) the arrest falls within one of the statutory exceptions." *State v. Steelman,* 93 S.W.3d 102, 107 (Tex. Crim. App. 2002); *see also McGee v. State,* 105 S.W.3d 609, 614 (Tex. Crim. App. 2003). Here, it is undisputed that the arresting officers had probable cause to arrest appellant for theft. Next, we must determine whether appellant's warrantless arrest fell within Article 14.04, which is the only applicable exception potentially supported by the record. Article 14.04 provides:

> Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused.

Art. 14.04. The purpose of the statute is to give effect to the constitutional guarantee against the unreasonable seizure of the person and to safeguard the public in the apprehension of offenders who would escape if a warrant was imperative. *See Bell v. State,* 724 S.W.2d 780, 787 (Tex. Crim. App. 1986) (citing *Rutherford v. State,* 283 S.W. 512, 514 (Tex. Crim. App. 1926)).

Exceptions to the warrant requirement are strictly construed in favor of the defendant.

*Dejarnette v. State,* 732 S.W.2d 346, 349 (Tex. Crim. App. 1987). For an arrest to be justified under Article 14.04, there must be some evidence amounting to satisfactory proof, either related by a credible person to an officer or observed by the officer, indicating that the defendant was about to escape and that there was therefore no time to procure a warrant. *Id.* at 351. "What must be shown by satisfactory proof is the legal equivalent of constitutional probable cause." *Hughes v. State,* 24 S.W.3d 833, 838 (Tex. Crim. App. 2000) (quoting *Earley v. State,* 635 S.W.2d 528, 531 (Tex. Crim. App. 1982)) (internal quotation marks omitted). This requires more than mere suspicion, but far less evidence than that needed to support a conviction or even a finding by the preponderance of the evidence. *Id.*

Whether an officer has satisfactory proof that an escape is imminent is a fact-specific inquiry that requires consideration of the circumstances as a whole. *See, e.g., Hughes,* 24 S.W.3d at 840; *Dejarnette,* 732 S.W.2d at 352. Relevant factors include the defendant's temporal and geographic proximity to the scene of the crime. *Hughes,* 24 S.W.3d at 839. For example, it is unreasonable to require an officer to break pursuit and abandon the fresh trail of a recently committed crime, so that he may obtain an arrest warrant in the hope of encountering a defendant at some later time. *See id.* (citing *Anderson v. State,* 932 S.W.2d 502, 506 (Tex. Crim. App. 1996); *West v. State,* 720 S.W.2d 511, 517 (Tex. Crim. App. 1986)).

Similarly, an officer's knowledge that a defendant has just committed an offense or has just been informed that the police are looking for him may signal that otherwise ambiguous conduct is consistent with fleeing, such that a warrantless arrest is justified. *See Dowthitt v. State,* 931 S.W.2d 244, 258 (Tex. Crim. App. 1996) (citing *Allridge v. State,* 850 S.W.2d 471, 491 (Tex. Crim. App. 1991)); *Dejarnette,* 732 S.W.2d at 352 ("Common experience teaches us that otherwise amorphous

actions of a suspect may take on characteristics of escape simply because of the temporal proximity of those actions to the crime or to the suspect's discovery of police pursuit"). For example, a warrantless arrest was justified when police observed a defendant speaking with someone they had just questioned about the offense, and then driving away in a rented truck. *King v. State,* 631 S.W.2d 486 (Tex. Crim. App. 1982).

On the other hand, when hours or days have elapsed from the time of the offense or from the time the defendant has been informed that the police are looking for him, it is generally unreasonable to arrest the defendant without a warrant unless his conduct or words reveal an intent to escape. For example, a defendant's conduct of driving away from his house in the morning before the courthouse opened did not justify dispensing with an arrest warrant when police had no reason to believe that he was aware that they were looking for him and the offense had been committed more than 24 hours before. *See Stanton v. State,* 743 S.W.2d 233, 235 (Tex. Crim. App. 1988). Similarly, when a defendant went to a local bar several hours after he had been told that the police were looking for him, he had not shown an intent to escape. *See Bell,* 724 S.W.2d at 787. His warrantless arrest was illegal, notwithstanding the officer's concern that he would not know where to find the defendant after the bar closed. *Id; see also Maixner v. State,* 753 S.W.2d 151, 152-54 (Tex. Crim. App. 1988) (warrantless arrest of defendant in a local night club, prompted by concern that he might flee if he saw media coverage of officers' discovery of murder victim, was not justified).

Knowledge that a defendant moves around a lot may be relevant to the inquiry, but without more, it does not justify dispensing with the warrant requirement. *See Bain v. State,* 677 S.W.2d 51, 56 (Tex. Crim. App. 1984) (overruled on another ground in *Black v. State,* 739 S.W.2d 240, 245 n.2 (Tex. Crim. App. 1987)) (officer's knowledge that the defendant was a "transient" and therefore he

"moved about" did not justify dispensing with the warrant requirement, but arrest was legal because officer discovered defendant hiding on a freight train in another town, which was conduct consistent with escaping). The escape requirement is met where the suspect has previously fled, but standing alone, the fact that the suspect left the crime scene at some time in the past does not mean that he has "previously fled." *See Dejarnette,* 732 S.W.2d at 353 & n.3 (Tex. Crim. App. 1987) (discussing *West v. State,* 720 S.W.2d 511 (Tex. Crim. App. 1986)); *see also Busby v. State,* 990 S.W.2d 263, 270 (Tex. Crim. App. 1999); *Dowthitt,* 931 S.W.2d at 259 (citing *Fearance v. State,* 771 S.W.2d 486, 510 (Tex. Crim. App. 1988)); *Stanton,* 743 S.W.2d at 237 (discussing *Trammell v. State,* 445 S.W.2d 190 (Tex. Crim. App. 1969), and indicating that recent prior conduct of eluding police would satisfy escape requirement).

Here, Steglich testified to the circumstances that led him to believe that appellant would try to escape. At the time he decided to arrest appellant, Steglich was aware that appellant had moved frequently between states and had many recent arrests in other states. Steglich was also aware that appellant did not have steady employment and had reported multiple addresses in Killeen as his residence. In addition, Steglich had some information about, but he could not confirm, an outstanding warrant from Florida. He had identified appellant as a person of interest in the investigation of a double murder committed two days earlier.

While these circumstances supported a generalized suspicion or hunch, they did not constitute satisfactory proof that appellant was about to escape such that there was no time to procure a warrant. Appellant's conduct that was known to the officers when they decided to arrest him contradicted any intent to escape. Appellant had cooperated with the district attorney's office and with Clemons concerning his pending theft case. He had completed a controlled drug buy earlier

in the month as part of "working off" that case. Appellant was still in Killeen two days after the murders.

After the officers contacted appellant, he still did not show any intent to escape. He returned Clemons's phone call, and he represented that he was taking steps to set up the controlled drug buy as instructed. He called Clemons with progress reports, and he willingly drove to the police station, where he seemed eager to cooperate. He allowed himself to be handcuffed so that he could be frisked and "wired" for the drug buy. He seemed anxious to complete the buy and was focused on getting his pending theft case dropped.

The assessment of whether officers have satisfactory proof that an escape is imminent is evaluated in light of "the information available to the officers at the time the evidence concerning escape is related to them," not evidence that is discovered when the defendant is later apprehended. *Dejarnette,* 732 S.W.2d at 351. Moreover, we will not speculate about facts that are not part of the record of the suppression hearing. "There is nothing in the 'concrete factual situation spread on the record' from which it can be deduced that appellant was, in fact, about to escape." *See Stanton,* 743 S.W.2d at 236. We conclude that appellant's warrantless arrest was illegal.

## B. Attenuation

Although appellant's warrantless arrest was illegal, the statements he made following his arrest may still be admissible if they were not tainted by the illegality. In determining whether the causal chain between the illegal arrest and appellant's statements was broken, such that his statements were the product of his free will, we consider four factors: (1) the giving of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *See Bell,* 724 S.W.2d

at 788 (citing *Brown v. Illinois,* 422 U.S. 590, 604-05 (1975)). Temporal proximity is an ambiguous factor that is weighed lightly, while the purpose and flagrancy of official misconduct is weighed heavily. *Bell,* 724 S.W.2d at 788; *Self v. State,* 709 S.W.2d 662, 668 (Tex. Crim. App. 1986). These factors are not exclusive, and each case must be decided on its own facts. *Self,* 709 S.W.2d at 668.

A finding of voluntariness for purposes of the Fifth Amendment is merely a threshold requirement for analysis under the Fourth Amendment because "[e]ven repeated warnings alone are not enough to purge the taint of an otherwise illegal arrest." *See Bell,* 724 S.W.2d at 788 (citing *Taylor v. Alabama,* 457 U.S. 687 (1982)). Here, Clemons first *Mirandized* appellant at 10:05 p.m., which was after appellant had been arrested for theft and had spontaneously begun talking about the murders, but before he was interrogated. Appellant continued talking about the murders after he was *Mirandized*. The first statement that Steglich took when he began interrogating appellant around 11:00 p.m. was a summary of information that appellant had voluntarily provided to Clemons prior to interrogation. Because this information was not inculpatory, Steglich completed this statement on a form that did not include written *Miranda* warnings. Appellant's second and third statements were completed on forms that included written *Miranda* warnings and waivers. Thus, appellant was *Mirandized* before and during the interrogation. This factor weighs in favor of attenuation.

The temporal proximity factor is also weighed lightly. *See Maixner,* 753 S.W.2d at 156. Appellant began volunteering information about the murders immediately after his arrest for theft. Lack of time for reflection, without significant intervening circumstances, generally weighs in favor of a defendant. *Bell,* 724 S.W.2d at 789. Here, however, it is apparent that appellant was not overwhelmed or intimidated by his arrest. *See, e.g., Rawlings v. Kentucky,* 448 U.S. 98, 108 (1980) (examining precise conditions of detention, including defendant's casual interaction with officers

and his spontaneous admissions, and weighing these factors heavily in favor of finding that defendant's admissions were made of his free will, unaffected by initial illegality, despite close timing). Appellant had been cooperating with Clemons and the district attorney's office in a drug investigation for several weeks, and he willingly went to meet with Clemons at the police station. Upon his arrest for theft, appellant spontaneously offered information about the murders with the hope of resolving his theft case. He was not then being interrogated. Accordingly, the temporal proximity factor favors suppression, but only lightly.

The fact that appellant spontaneously volunteered information about the murders, without being interrogated, is a significant intervening circumstance. *See Bell,* 724 S.W.2d at 789 n.5; *see also Crutsinger v. State,* 206 S.W.3d 607, 610 (Tex. Crim. App. 2006) (following illegal arrest, defendant's request to speak with detective was an independent act of free will and an intervening circumstance that weighed heavily in the State's favor). Furthermore, appellant was not interrogated until after the arrest warrant had been obtained. "Since the illegality was the lack of a warrant, after the warrant was obtained the causal relationship between the illegal arrest and subsequent evidence was severed." *Bell,* 724 S.W.2d at 791-92. This factor strongly favors attenuation.

The purpose and flagrancy of the official misconduct in this case also tends to favor attenuation. Most importantly, there was probable cause to arrest appellant for theft, and so the warrantless arrest, although illegal, did not violate the Fourth Amendment. *See Brick v. State,* 738 S.W.2d 676, 681 (Tex. Crim. App. 1987) (citing *Self,* 709 S.W.2d at 667-68) (fact that illegality rests solely upon violation of statute may influence assessment of purposefulness and flagrancy of misconduct, and, all other factors weighing equally, may ultimately tip the balance).

Additionally, this was not a situation where officers simply ignored the warrant requirement.

*Cf. Stanton,* 743 S.W.2d at 235, 237 (implicitly disapproving officers' untested assumption that they could not obtain an arrest warrant in time because the courthouse was closed). The record reflects that Steglich began seeking an arrest warrant around the same time that he decided to arrest appellant, and he continued working to obtain the warrant while Clemons executed the plan to arrest appellant. Steglich was investigating a double murder, and he was aware that whoever committed the crime was still at large. *Cf. Maixner,* 753 S.W.2d at 157.

Furthermore, there is no indication in the record that Clemons's conduct toward appellant, before and during the warrantless arrest, was calculated to cause surprise, fright, and confusion. Appellant went willingly (albeit under false pretenses) to the police station in response to a call from Clemons, under the terms of a pre-existing contract to work off his theft case.

Other considerations temper our assessment of this factor. The officers initiated their plan to arrest appellant at a time when they knew that they did not have, but needed, an arrest warrant. The record contains no explanation for why they contacted appellant for the purpose of luring him to the police station and arresting him without first obtaining a warrant.

In addition, although Steglich had probable cause to arrest appellant for theft, he never purported to have probable cause to arrest appellant for the murders. In this sense, the illegal arrest for theft was an expedition for evidence, undertaken in the hope that something might turn up in the murder investigation. This purpose for the arrest may favor suppression. *See Self,* 709 S.W.2d at 667 (quoting *Brown,* 422 U.S. at 605) (illegal arrest that was an expedition for evidence constituted flagrant official misconduct); *but see Crutsinger,* 206 S.W.3d at 611 (official misconduct was not purposeful or flagrant when police had probable cause to arrest defendant for credit-card abuse, but did not have a warrant, and the purpose of the arrest was to further a murder investigation).

A consideration that is more difficult to assess is the deception involved in the scheme to lure appellant to the police station in order to arrest him for theft and question him about the murders. We have hinted in the past that the use of deception to obtain a confession following an illegal arrest may favor suppression. *See Bell,* 724 S.W.2d at 789-90 (citing to J. Powell's concurrence in *Brown,* 422 U.S. at 611, and identifying illegal arrests effectuated as pretexts for collateral objectives as among the "most flagrantly abusive;" also observing that other jurisdictions have found unattenuated taint when illegal arrest was for the purpose of obtaining a confession and the arrestee was misled about that purpose); *see also Farmah v. State,* 883 S.W.2d 674, 679 (Tex. Crim. App. 1994) (when defendant was arrested without probable cause, officer's false claim that complainant had selected defendant out of a photo line-up, immediately followed by defendant's confession, weighed in favor of suppression); *Foster v. State,* 677 S.W.2d 507, 510 (Tex. Crim. App. 1984) (implicitly disapproving, following illegal arrest, ingratiatory police overtures and tactics that were "calculated to raise false hopes" and make defendant, a former prosecutor, "feel as if he were one of them, and his arrest was merely a 'matter that needed to be cleared up'").[6]

However, in other circumstances, we have found that the use of deception operated to diminish the flagrancy of the misconduct associated with an illegal arrest. *See Dowthitt,* 931 S.W.2d

---

[6] In this respect, our Fourth Amendment analysis differs from our Fifth Amendment analysis. Assuming a lawful arrest, we have consistently found that the use of deception to obtain a statement does not violate due process. *See, e.g., Oursbourn v. State,* 259 S.W.3d 159, 182 & n.88 (Tex. Crim. App. 2008) (and cases cited therein) ("It is well established that lying about the state of the evidence is not the sort of 'overreaching' that implicates the due process clause, so long as the subterfuge used is not one likely to produce an untrue statement").

Finding that the use of deception does not violate due process, but recognizing that it may nevertheless exacerbate the flagrancy of the misconduct associated with an illegal arrest, is consistent with the well-settled principle that, in order for the causal chain between the illegal arrest and the statement to be broken, it is not enough that the statement meets the Fifth Amendment standard of voluntariness; rather, the statement must be sufficiently an act of free will to purge the primary taint. The statement's admissibility must be considered in light of the distinct policies and interests of the Fourth Amendment. *See Maixner,* 753 S.W.2d at 155; *Self,* 709 S.W.2d at 665 (quoting *Brown,* 422 U.S. at 601-602).

at 262 (officers' statements expressing confidence in Dowthitt's innocence may have been psychological manipulation, but they diminished flagrancy of misconduct and attenuated taint of warrantless arrest because they were made in an attempt to maintain a non-custodial atmosphere and assure and mollify the defendant, rather than in an attempt to surprise, frighten, and confuse him). Here, it is at least arguable that the use of deception to arrest appellant at the police station operated to assure and mollify him by minimizing the confrontational nature of the encounter.

On the particular facts of this case, the unexplained failure to wait for an arrest warrant and the use of deception did not render the misconduct flagrant and purposeful, while appellant's spontaneous declaration that he had information about the murders, plus the fact that the arrest warrant was obtained prior to interrogation, were significant intervening circumstances. We conclude that appellant's statements were sufficiently attenuated from the illegal arrest to be admissible. Therefore the trial court did not err in denying the motion to suppress these statements. Point of error five is overruled.

THE "10-12" RULE

In point of error six, appellant claims that the trial court erred by declining to hold the "10-12 Rule" unconstitutional. Appellant asserts that Article 37.071, § 2(a) creates an impermissible risk of arbitrariness, denies a defendant's right to individualized sentencing, denies the right to a fair and impartial jury, prevents a defendant from receiving effective assistance of counsel, and has a coercive effect upon the jury. We have consistently rejected these arguments. *See, e.g., Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Threadgill,* 146 S.W.3d at 673; *Hathorn v. State,* 848 S.W.2d 101, 125 (Tex. Crim. App. 1992). Appellant has not persuaded us to revisit them here. Point of error six is overruled.

We affirm the judgment of the trial court.


Delivered: December 16, 2009
Do Not Publish