

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JESSE ADRIAN MARTINEZ, | § | |
| | | No. 08-17-00253-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 210th District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20160D03012) |
| | § | |

## **O P I N I O N**

After being charged with one count of capital murder and one count of tampering with physical evidence, Appellant Jesse Adrian Martinez filed a motion to suppress in which he sought suppression of his videotaped confession to the El Paso Police Department alleging it was obtained through a violation of his constitutional rights and resulted from an unlawful arrest. After holding a hearing, the trial court denied Martinez's motion. Pursuant to a plea bargain with the State in which he did not waive his right to appeal the trial court's suppression ruling, Martinez pleaded guilty to the lesser-included offense of murder, agreed to a deadly weapon finding, and further admitted his guilt to the charge of evidence tampering under section 12.45 of the Penal Code. *See* TEX. PENAL CODE ANN. § 12.45. In two issues on appeal, Martinez challenges the trial court's

denial of his motion to suppress.  We affirm.

## BACKGROUND

*Factual Background*

On Friday, April 15, 2016, at about 1:16 a.m., Detectives Lara and Parsons, who were assigned to the Crimes Against Persons unit of the El Paso Police Department, met with Martinez at their unit's office.  At about 12:30 a.m., plain-clothes officers had brought Martinez to the office in a regular, non-marked car, and his mother, who also had come to the office that morning, was elsewhere in the building.  Detective Lara had been investigating Martinez's alleged involvement in the murder of Tristan Mina based on a statement given by Samuel Rico, an eventual co-defendant with Martinez and Jose Andrade.  Detective Lara also had a statement from Abner Robles who had been identified as a witness to certain events occurring after the murder but who had not been identified as having participated in committing the murder.

According to Detective Lara, Rico's statement corroborated the one he eventually obtained from Martinez with Rico implicating Martinez "in almost the same fashion that [Martinez] told us in his statement."  Furthermore, the statements from Rico and Robles indicated that Martinez was present at the scene of Mina's murder and that Martinez had admitted to setting up the cocaine purchase that led to Mina's murder.  Robles also told Detective Lara's partner Detective Parsons that Andrade admitted to his involvement in Mina's murder.  Officers had been called out to the scene only a few days prior, on April 10, and Mina's body had not yet been discovered.  Beginning on April 10, Detective Lara, Detective Parsons, and a few other officers had been assigned to investigate the case.

When Detectives Lara and Parsons first approached Martinez in the CAP office, Martinez

2

had been waiting in a separate family area that had a television and not in handcuffs. The detectives led Martinez into an interview room. Detective Lara began his interview by explaining that he and Detective Parsons were investigating a missing-person case that originated from a police dispatch to the west side of town on the afternoon of Sunday, April 10. After officers investigated, they found suspicious blood and property, and subsequently, the victim, Mina, was designated as a missing person. Detective Lara then advised Martinez of his *Miranda* rights, including his right to have an attorney present before and during any questioning.[1] Detective Lara also advised Martinez of his right to end the interview at any time. Martinez stated that he understood his rights, and he requested an attorney. Detective Lara then ended the interview without asking any further questions. This first interview lasted approximately three minutes and ended at 1:19 a.m.

Detective Lara advised Martinez that he was under arrest, and Martinez was then escorted from the interview room to an adjoining holding cell at the office. Once inside the cell, Martinez was handcuffed to a restraining bar, and the cell door was locked.[2] Detective Lara believed that the arrest was proper under "Chapter 14, arrest without warrant" because, based on Rico's statement, he believed he had sufficient probable cause of Martinez having committed a murder, and he was concerned that Martinez might "take off" if released. Likewise, Detective Parsons believed that they had authority to arrest Martinez for Mina's murder based on the probable cause they developed by interviewing "a couple of other witnesses[.]" Neither detective asked Martinez any further questions once he was placed in the cell, and Detective Lara continued with his

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The holding cell door was metal but made of a "barbed wire-type of mesh" such that someone inside the cell could be clearly seen and heard even when the door was closed.

investigation and discussed with his supervisor the necessary steps to obtain an arrest warrant while Detective Parsons began typing a complaint affidavit for the warrant.

About 15 minutes after placing Martinez in the holding cell, Martinez "flagged" Detective Lara down, without any prompting, as he walked past the cell while on his way to his sergeant's office stating that he wanted to talk and give a statement. Detective Lara told Martinez that he was going to need to re-read the *Miranda* warnings to Martinez. Detective Lara then restarted and prepared the recording system. At that time, neither Detective Lara nor Detective Parsons had yet had the opportunity to take any steps to obtain an attorney for Martinez. Detective Lara explained at the suppression hearing that if Martinez did not want to speak to him without an attorney present then he was not going to speak to Martinez at all, even about obtaining an attorney, in order to afford Martinez his right to have an attorney present. In addition, Detective Lara was unaware of any policies of the El Paso Police Department that required him to immediately locate an attorney for a suspect who had requested one. In his experience, a defendant would have an attorney appointed to them once they were formally taken to a magistrate after their arrest. Martinez could not have been taken to a magistrate without a completed complaint affidavit, and the detectives were still working on paperwork at the time Martinez interrupted the process by flagging down Detective Lara.

After the recording system was ready, Detective Lara brought Martinez from the holding cell back into the interview room. Once again, only Martinez and Detectives Lara and Parsons were present for this second videotaped interview that began at 1:46 a.m. and ended at 2:41 a.m. At the start of this interview, Martinez affirmatively acknowledged that he flagged down Detective Lara and asked to give a statement. After Detective Lara informed Martinez of his *Miranda* rights,

4

including the right to have an attorney, Martinez answered affirmatively that he understood his rights and wished to continue the interview. To Detective Lara, Martinez appeared to have understood his rights and freely and voluntarily waived them.

During this second interview of approximately one hour in length, Martinez did not request an attorney, and he did not ask for the interview to cease. Both detectives testified at the suppression hearing that they did not use coercive or threatening tactics, did not promise Martinez anything in exchange for the statement, and did not deny Martinez basic necessities, such as food or use of the restroom, during the interview. Both detectives also testified that Martinez did not appear to be under the influence of alcohol or any narcotic drug.

In his second videotaped statement, Martinez divulged that he, Robles, Rico, and Andrade were drinking together at Andrade's home when they decided to buy some cocaine. At about midnight, Martinez called Mina to set up a purchase. Mina told Martinez that he could get an eight ball of cocaine for the group, Martinez and Mina agreed to split the cost, and though Robles left the group, the three accomplices drove over to Mina's address in Rico's car. When the three arrived, they met with Mina outside, they all began drinking inside Rico's car, and Mina told them that he had about $200 to spend that night. Eventually the cocaine supplier arrived, and Mina alone went over to the supplier's car to get the cocaine. The group then proceeded to use the cocaine and drink some more, and after about 30 minutes, they agreed to purchase another eight ball. Mina called his supplier again, and when the supplier arrived, Mina again went to the supplier's car alone. While Mina was making this second trip over to the supplier's car, Martinez, Rico, and Andrade agreed they would rob Mina. [3]

---

[3] Martinez also told the detectives that the three co-defendants discussed stealing the supplier's Lexus but that they

Martinez denied knowing that Andrade would badly hurt or even kill Mina, and Martinez told Andrade, "[y]ou oughta just punch him, dude, like you're bigger than him," during a conversation in which Andrade said he was going to hit Mina with something or stab him with a knife. An aluminum bat was on the car floorboard, and Martinez stated, "I guess he saw the bat like on the floor and shit and he grabbed it." Martinez knew that Andrade was going to assault Mina in order to accomplish the robbery, but Martinez thought that a punch "would knock him out" to achieve that goal.

When Mina returned to Rico's car, the group drove down the block and began using the cocaine. After some time, Andrade and Mina exited the vehicle leaving Martinez and Rico inside. Martinez then heard a thud, went to check on what made the sound, and saw Mina knocked out cold and lying on the ground. In his statement, Martinez denied seeing Andrade holding the aluminum bat. Martinez then approached Mina to check on his pulse and saw that Mina was still breathing, but Martinez then panicked and went back inside the car. Andrade and Rico then put Mina in the car trunk.

Although Andrade told Martinez that they were all "in this already," Martinez responded that he did not want any part of it and that he wanted to go home. Before Martinez got home, the group stopped at Robles's house so that Martinez could check on whether he had any evidence of the robbery on him and to change his clothes if necessary. After Martinez changed some of his clothes, the other two accomplices drove him home. Martinez then fell asleep. A day or two later, Martinez went to a car wash with Rico and Robles in the early morning hours between 2 and 4 a.m., and the three were "taking off the plastic, tearing the plastic" from the wheels of Rico's car

learned from Mina that the supplier was "strapped."

"[j]ust for it could be not -- like not on the radar of the cops." Later that same day after Martinez's work ended, he, Andrade, and Robles went to an area in Santa Teresa off the roadway, and Andrade began burning what appeared to be clothes. While Andrade did this, he described what happened during the assault on Mina to the others. On another occasion, Rico described the assault to Martinez, as well. Both Andrade and Rico told Martinez that they buried Mina. Andrade had also previously told Robles about what they had done to Mina. In the interview, Martinez acknowledged that Andrade was simply following through with their previously discussed plan to rob Mina. Martinez also stated that, after the robbery, he was at Rico's house, saw the same bat that was in Rico's car, and told the others, "you guys need to get rid of that shit."

*Procedural Background*

At the suppression hearing, Martinez also testified to his account of events. Martinez testified that he was nineteen years' old at the time of his videotaped statements and that he had never before been arrested or questioned by police. He testified that four "detectives" picked him up from his home and took him to the police station in an unmarked "cruiser." They did not handcuff him, but informed him that they were taking him to the station to ask him "some questions." His mother came with him to the station, as well.

Once at the station, Martinez testified that he was taken "straight into" an interrogation room. Before he entered the room, his mother told him that she was in the process of getting him an attorney. Once Martinez requested an attorney and the detectives ended the first interview, the detectives handcuffed Martinez and informed him that he was going to be charged with murder. Before entering the holding cell, Martinez testified that he told Detective Lara that he did not kill anybody. Detective Lara responded that he could not talk to Martinez unless Martinez waived his

7

rights. Once Martinez was handcuffed to a bench inside the cell, he became "scared" and "terrified." Martinez testified that he flagged down Detective Lara because he was scared and, in his mind, he "wanted to get the situation handled."

Martinez admitted that he understood his *Miranda* rights, including his right to an attorney, and that he waived those rights prior to giving his statement in a second videotaped interview. He also admitted that his statement was freely and voluntarily given. While he testified that he was on cocaine at the time he gave his statement, he acknowledged that his cocaine use did not have any impact on his understanding of his rights.

At the conclusion of the hearing, the trial court denied Martinez's motion to suppress. The trial court stated its findings on the record and expressly found that Martinez understood his rights and freely and voluntarily made his confession after initiating contact with Detective Lara. The trial court also found that he was not under the influence of alcohol or any drug at the time of his confession.

Martinez timely filed his notice of appeal from the trial court's ruling.

## DISCUSSION

Martinez advances two issues. In Issue One, Martinez asserts his right to counsel was violated and his statement was given involuntarily. In Issue Two, Martinez asserts the trial court erred when it failed to suppress Martinez's confession as fruit of an unlawful arrest.

### *Standard of Review for a Ruling on a Motion to Suppress*

We review a trial court's ruling refusing to suppress evidence for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *Saenz v. State*, 564 S.W.3d 469, 472 (Tex. App. – El Paso 2018, no pet.). We apply a bifurcated standard of review in which we give

8

almost total deference to a trial court's determination of historical facts, particularly when the trial court's findings are based on an evaluation of credibility and demeanor. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). We afford the same deference to mixed questions of law and fact if resolving those questions turns on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997); *State v. Alderete*, 314 S.W.3d 469, 472 (Tex. App. – El Paso 2010, pet. ref'd). However, we review *de novo* the application of legal principles to a specific set of facts. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *Alderete*, 314 S.W.3d at 472.

When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex. Crim. App. 2006). Regardless of whether the motion to suppress was granted or denied, the prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Garcia-Cantu*, 253 S.W.3d at 241. An appellate court may uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007).

### Issue One: Whether Martinez's Right to Counsel was Violated and His Statement Given Involuntarily

In his first issue, Martinez argues that his second videotaped statement should have been suppressed because the detectives did not obtain a valid waiver of his right to counsel after his invocation of that right during his first videotaped interview. In response, the State argues that because Martinez was not in custody at the time of his purported invocation of his right to counsel, Martinez's invocation was ineffective; and further, the rule established in *Edwards v. Arizona* did

9

not apply to require that Martinez himself be the party who reinitiated contact with the detectives in order for his subsequent waiver of rights to be voluntary. Alternatively, the State argues that even if Martinez's purported invocation had been effective, we should defer to the trial court's express, record-supported finding that Martinez reinitiated contact with the detectives. In either case, the State ultimately urges us to hold that the trial court did not abuse its discretion in denying the motion to suppress because the totality of the circumstances showed that Martinez voluntarily waived his *Miranda* rights.

### The *Edwards* Rule and the Voluntariness Inquiry

In *Edwards v. Arizona*, the U.S. Supreme Court set out a bright-line rule designed to protect an accused in police custody from being badgered by police officers holding that once an accused has expressed his desire to deal with police only through counsel then all custodial interrogation must cease unless the accused himself initiates further communication, exchanges, or conversation with the police. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983); *Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004); *Engleton v. State*, No. 08-13-00077-CR, 2015 WL 1285202, at *4 (Tex. App. – El Paso Mar. 20, 2015, no pet.) (not designated for publication). Nonetheless, it is also well-established that a suspect is not powerless to thereafter countermand his election to speak with police only with the assistance of counsel. *See Edwards*, 451 U.S. at 485; *Cross*, 144 S.W.3d at 526; *Engleton*, 2015 WL 1285202, at *4.

Of course, the rights afforded by *Miranda* apply only to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Herrera v. State*, 241 S.W.3d 520, 525-26 (Tex. Crim. App. 2007). With this understanding, the Texas Court of Criminal Appeals has adopted the rule that

10

police are not required to honor anticipatorily made invocations of *Miranda* rights when the attempted invocation is done in a noncustodial interrogation setting. *See Estrada v. State*, 313 S.W.3d 274, 295-96 (Tex. Crim. App. 2010) (rejecting appellant's reliance on precedent from the United States Court of Appeals for the Tenth Circuit in arguing that the government must honor invocations of *Miranda* rights even if done outside of custodial interrogation and adopting the opposite perspective in holding that police are not required to honor invocations during a noncustodial interrogation setting). This rule recognizes that the need to scrupulously honor a defendant's invocation of his or her *Miranda* rights does not necessarily arise until created by the pressures of custodial interrogation. *Id*. at 296. The Texas rule accords with U.S. Supreme Court precedent recognizing that it has never held that a person can invoke his or her *Miranda* rights anticipatorily in a context outside of custodial interrogation. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation' . . . The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.") [Internal citations omitted].

Thus, the *Edwards* rule cannot be triggered if a defendant attempts to invoke a *Miranda* right while not in custody. *See Miera v. State*, No. 13-09-00166-CR, 2010 WL 3390146, at *8 (Tex. App. – Corpus Christi Aug. 30, 2010, pet. ref'd) (mem. op., not designated for publication); *Russell v. State*, 215 S.W.3d 531, 534-36 (Tex. App. – Waco 2007, pet. ref'd); *Brossette v. State*, 99 S.W.3d 277, 282 (Tex. App. – Texarkana 2003, pet. dism'd). A person is in custody for purposes of *Miranda* only if, under the circumstances, a reasonable person would believe that his

11

freedom of movement was restrained to the degree associated with a formal arrest. *See State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012); *State v. Luna*, No. 08-16-00273-CR, 2019 WL 1925004, at \*5 (Tex. App. – El Paso Apr. 30, 2019, no pet.) (not designated for publication).

Ultimately, the State has the burden of showing that a defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights when such rights are implicated. *See Miranda*, 384 U.S. at 475; *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). To evaluate whether an accused so waived his or her rights, a reviewing Court considers the following:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Joseph*, 309 S.W.3d at 25 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). This totality-of-the-circumstances approach requires the consideration of all the circumstances surrounding the interrogation, including the defendant's experience, background, and conduct. *Joseph*, 309 S.W.3d at 25. A valid waiver need not be expressly made. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010); *Joseph*, 309 S.W.3d at 24; *Gately v. State*, 321 S.W.3d 72, 77 (Tex. App. – Eastland 2010, no pet.). Where the State shows that *Miranda* warnings were given, that they were understood by the defendant, and that the defendant engaged in a "course of conduct indicating waiver," such as by further participating in an interview, the defendant's uncoerced statement establishes an implied waiver of his rights. *See Berghuis*, 560 U.S. at 384; *see also Joseph*, 309 S.W.3d at 24; *Gately*, 321 S.W.3d at 77-78.

**Application**

12

At the outset, we hold that the *Edwards* rule did not apply here because Martinez was not in custody at the time that he allegedly invoked his right to counsel. A group of plain-clothes officers brought Martinez to the Crimes Against Persons office in a regular, non-marked car. Martinez's mother followed him to the office, and Martinez was furnished with a separate waiting area that included a television. Throughout this time, Martinez was not in handcuffs. It was not until after Martinez invoked his right to counsel that he was finally told he was under arrest, handcuffed, and placed in the holding cell. We acknowledge that Martinez testified that the four "detectives" picked him up in a "cruiser," that they told him they were taking him to the police station, and that he was immediately taken into the interrogation room. However, as the finder of fact at the suppression hearing, the trial court must evaluate the credibility and demeanor of witnesses in making determinations of historical fact. *See St. George*, 237 S.W.3d at 725; *Alderete*, 314 S.W.3d at 472. The trial court was free to reject any testimony from Martinez. *See Garcia*, 569 S.W.3d at 155 n.68; *Graham*, 201 S.W.3d at 330. The court appeared to do so in accepting the State's version of events and in denying his motion to suppress.

Under the circumstances here, Martinez was not faced with any restriction on his freedom of movement to the degree associated with a formal arrest at the time he requested an attorney during his first videotaped interview, and he was therefore not in custody at that time.[4] *See Ortiz*, 382 S.W.3d at 372; *Luna*, 2019 WL 1925004, at *5; *see also Turner v. State*, 252 S.W.3d 571, 579-80 (Tex. App. – Houston [14th Dist.] 2008, pet. ref'd) (holding that the defendant was not in custody where he voluntarily accompanied police officers, who were then only in the process of

---

[4] In his brief to this Court, Martinez acknowledges that he "voluntarily went to CAP [Crimes Against Persons] to be interviewed by detectives."

investigating a crime, to a certain location and where he knew or should have known that the police officers suspected he may have committed or may have been implicated in committing the crime). And since he was not in custody, the *Edwards* rule did not apply to the actions taken by Detectives Lara and Parsons in seeking a statement from Martinez. *See Miera*, 2010 WL 3390146, at \*8 ("Assuming, without deciding, that Miera clearly expressed his desire to contact an attorney, as previously discussed, Miera was not in custody. Thus, the *Edwards* standard requiring termination of all police interrogation once an attorney is requested is not applicable in this case."); *Russell*, 215 S.W.3d at 534-36 (holding that defendant's request for an attorney did not trigger the *Edwards* rule where defendant was not dealing with custodial interrogation); *Brossette*, 99 S.W.3d at 282 ("While the evidence is undisputed that Brossette did request an attorney and that Lieutenant Box further interrogated Brossette after this request and before an attorney was provided, it is clear that Brossette was not in custody. Rather, Brossette was at the police station on his own volition, and he was free to leave in his own vehicle at any point. Therefore, the *Edwards* standard requiring termination of all police interrogation once an attorney is requested is not applicable in this case."). We need not reach the State's alternative argument that *Edwards* did not apply here due to Martinez's reinitiation of contact with Detective Lara.

Having found that the *Edwards* rule does not apply here, we now turn to whether the State carried its ultimate burden of showing that Martinez knowingly, intelligently, and voluntarily waived his *Miranda* rights. This determination is made easier due to Martinez himself testifying at the suppression hearing that he understood his *Miranda* rights, he waived those rights, and he freely and voluntarily gave his statement. That testimony is dispositive of the question raised here. But in any case, the remainder of the record supports the trial court's findings of voluntariness, as

14

well. When the detectives first brought Martinez into the interview room for the first videotaped statement, Detective Lara explained the underlying facts on which his investigation was based and the specific crime he was investigating. Detective Lara advised Martinez of his *Miranda* rights, and before requesting an attorney, Martinez stated that he understood his rights. Once Martinez requested an attorney, Detective Lara immediately ended the interview, and both detectives respected Martinez's request by refraining from asking him further questions. When Martinez later flagged down Detective Lara without any prompting, Detective Lara responded that he was going to need to re-read the *Miranda* warning to Martinez, and once the detectives brought Martinez back into the interview room, Detective Lara proceeded to make good on that admonition by informing Martinez of those rights a second time. Martinez again affirmatively answered that he understood his rights, and he wished to continue that interview. Both detectives testified that they did not use coercive measures, make any promises, or deny Martinez basic amenities during the interview. Detective Lara testified that Martinez appeared to have understood his rights and freely and voluntarily waived them, and both detectives testified that Martinez did not appear to be under the influence of alcohol or any narcotic drug – a fact expressly incorporated into the trial court's findings.

In his brief to this Court, Martinez argues that we should place significant weight in our analysis on the fact that neither of the detectives provided him with the means to contact an attorney once he requested one and that they instead simply left him sitting alone in a holding cell where they had placed him. However, Detective Lara explained that his intention by his actions was to afford Martinez the right he requested by not speaking to him. In accordance with their usual procedures, the detectives also needed more time to complete a complaint affidavit before

15

taking Martinez to a magistrate who would then be able to appoint an attorney for Martinez's representation. Additionally, the detectives' failure to immediately find Martinez an attorney during the short passage of time before he reinitiated contact with them did not demonstrate that the detectives intended to deprive him of access to counsel in any coercive fashion. *Cf. Engleton*, 2015 WL 1285202, at *5 (rejecting appellant's contention that the passage of 15 minutes from the time that he invoked his rights until the time he reinitiated contact with police necessarily compelled the conclusion that appellant believed his initial requests had been ignored).

Based on the totality of the circumstances detailed above, we hold that Martinez knowingly, intelligently, and voluntarily waived his *Miranda* rights because his own testimony necessitates our conclusion and the record provides further support. *See Joseph*, 309 S.W.3d at 25; *see also Gately*, 321 S.W.3d at 78 (holding that, even though the defendant never expressly waived his rights, a knowing, intelligent, and voluntary waiver could be inferred where the defendant was advised of his rights, stated that he understood his rights, agreed with the interviewing detective that he wanted to speak to the detective, and willingly participated in the interview). We overrule Martinez's first issue presented for review.

### Issue Two: Whether the Nexus Between Martinez's Arrest and Statement was Sufficiently Attenuated

In his second issue, Martinez argues that the trial court erred when it failed to suppress his statement as fruit of an unlawful warrantless arrest. He asserts that he voluntarily went to the CAP's office to be interviewed by detectives. But after detectives explained that he had the right to an attorney and he unequivocally invoked his right to counsel; he was placed under arrest for murder. Under these circumstances, Martinez argues that his arrest was illegal and the statement that was obtained almost immediately after his illegal warrantless arrest should have been

16

suppressed. Responding, the State first concedes that Martinez's arrest did not fall under one of the statutory exceptions for a warrantless arrest pursuant to the Code of Criminal Procedure. To that extent, the State acknowledges the arrest was statutorily non-compliant and thereby subject to an attenuation-of-taint analysis under factors set out in *Brown v. Illinois*.[5] Nonetheless, the State argues that Martinez's arrest was supported by probable cause. The State asserts that detectives had obtained a statement from Rico, which implicated Rico and Martinez, and Rico's statement was sufficient to establish probable cause to arrest Martinez for robbery, at the very least, and, more severely, for capital murder. Supported by probable cause, the State argues that Martinez's warrantless arrest did not violate the Fourth Amendment. The State argues that the nexus between Martinez's arrest and his statement was sufficiently attenuated to dissipate the taint of any prior illegality. Thus, the State argues that Martinez's warrantless arrest constituted only a statutory, rather than constitutional, violation.

### Attenuation

The "fruit of the poisonous tree" doctrine generally precludes the use of evidence obtained following an illegal arrest. *See Wong Sun v. U.S.*, 371 U.S. 471, 484 (1963); *Monge v. State*, 315 S.W.3d 35, 40 (Tex. Crim. App. 2010). Evidence that is sufficiently attenuated from an unlawful arrest is not considered to have been obtained therefrom. *Monge*, 315 S.W.3d at 40. The prosecution carries the burden of proving attenuation. *Id*.

In deciding whether a defendant's confession, which follows an illegal arrest, was sufficiently attenuated as to permit its use at trial, we are to consider the following factors:

(1) whether *Miranda* warnings were given;

---

[5] *See Brown v. Illinois*, 422 U.S. 590, 603-604 (1975).

17

(2) the temporal proximity of the arrest and the confession;

(3) the presence of intervening circumstances; and

(4) the purpose and flagrancy of the official misconduct.

*See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *Monge*, 315 S.W.3d at 40. These factors do not necessarily carry equal weight. *See Monge*, 315 S.W.3d at 40; *Bell v. State*, 724 S.W.2d 780, 788-89 (Tex. Crim. App. 1986). No single factor is decisive. Instead, we must examine each factor in turn then consider the effect of all factors taken as a whole. *Monge*, 315 S.W.3d at 40.

### Application

#### *The Administration of Miranda Warnings*

*Miranda* warnings are an important and necessary factor in determining whether the confession is obtained by exploitation of an illegal arrest. *Id.* However, the fact that a *Miranda* warning has been given is not alone sufficient to break the causal connection between an illegal arrest and the confession. *Id.* In this case, Martinez was given *Miranda* warnings at the beginning of each of his two videotaped interviews. Repetition of warnings weighs in the State's favor. *See id.* at 40-41 (holding that this first factor weighed in the State's favor where a single *Miranda* warning was given to the defendant before his confession).

#### *The Temporal Proximity Between Arrest and Confession*

Temporal proximity is generally not a strong determining factor. *Id.* at 41. Nevertheless, if there is a short period of time—usually, under three hours—between the illegal arrest and the confession, this factor will weigh in favor of the defendant. *Id.* The State concedes that this factor weighs in Martinez's favor, and we find that the record supports that concession where only 27 minutes elapsed between his first and second interview. *See id.* (holding that this second factor

18

weighed in the defendant's favor where there was only a short, approximately two-hour period of time between the defendant's illegal arrest and confession).

*The Presence of Intervening Circumstances*

The presence of an intervening circumstance is an important factor. *Id*. Generally, a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint. *Id*. However, the lack of intervening circumstances is not dispositive if other *Brown* factors weigh strongly in favor of the State. *Id*. A defendant's request to speak with a detective after an unlawful arrest, as a product of his own free will, has been recognized as being an intervening circumstance that "weighs heavily in the State's favor" in the attenuation analysis. *See Crutsinger v. State*, 206 S.W.3d 607, 611 (Tex. Crim. App. 2006) (holding that this third factor weighed heavily in the State's favor because the defendant's request to speak to a detective was an intervening circumstance and a product of his own free will where the defendant became emotional very shortly after the detective stepped out of the holding room, stated that he had "messed up," and asked to speak to the detective); *see also Bell*, 724 S.W.2d at 789 n.5 (observing that one example of a significant intervening circumstance would include a volunteered statement that was not made in response to police interrogation).

Here, the trial court found that Martinez reinitiated contact with Detective Lara. This finding is supported by the record based not only on Martinez's testimony that Martinez flagged down Detective Lara without any prompting, but also by his own admission in his second videotaped interview that he had done so. As discussed above, Martinez further admitted that he

19

understood his rights, waived them, and voluntarily gave his statement. We therefore hold that Martinez's re-initiation of communication with Detective Lara was an intervening circumstance borne of his own free will, which supports the weighing of this factor heavily in the State's favor. *See Crutsinger*, 206 S.W.3d at 611; *see also Bell*, 724 S.W.2d at 789 n.5.

### *The Purpose and Flagrancy of Official Misconduct*

Purpose and flagrancy of official misconduct is one of the most important factors to be considered. *Monge*, 315 S.W.3d at 42. When official misconduct is the most flagrantly abusive, the standard for the State to prove attenuation is elevated to require the clearest indications of attenuation. *Id.* Examples of such abusive conduct may include reliance on factors in making an arrest which were so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable, an arrest effectuated as a pretext for collateral objectives, or an arrest which is unnecessarily intrusive on personal privacy. *Id.* Similarly, the taint may not be attenuated if the accused was arrested with no apparent justification and with the sole intent to extract a confession by exploitation. *Id.* These examples contrast with situations in which probable cause exists and the failure to get an arrest warrant amounts to comparatively less serious misconduct. *Monge*, 315 S.W.3d at 42; *see also, e.g., Renfro v. State*, 958 S.W.2d 880, 886 (Tex. App. – Texarkana 1997, pet. ref'd) (observing the important distinction in the attenuation case law from the Court of Criminal Appeals between a situation involving a constitutional violation and one involving only a statutory violation and acknowledging this distinction as follows: "It appears the court is saying that a constitutional violation is of a much more serious nature and would likely constitute flagrant misconduct, while a statutory violation alone, depending on the misconduct involved, is less likely to rise to the level of flagrant misconduct, even though it is misconduct nonetheless.").

20

Therefore, in reviewing any potential misconduct of the State, it would aid a reviewing Court to first determine whether the conduct was a constitutional or statutory violation of a defendant's rights. In this regard, the U.S. Supreme Court has instructed that whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law but that a warrantless arrest satisfies the Fourth Amendment so long as the officer has probable cause to believe that the suspect has committed or is committing an offense. *See Virginia v. Moore*, 553 U.S. 164, 173 (2008) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)); *see also Hernandez v. State*, No. 10-14-00302-CR, 2018 WL 1528440, at *4 (Tex. App. – Waco Mar. 28, 2018, pet. ref'd) (mem. op., not designated for publication). In addition to this constitutional probable-cause requirement, Texas statutory law requires that a warrantless arrest fall within one of the exceptions specified in articles 14.01 through 14.04 of the Code of Criminal Procedure. *See State v. Martinez*, 569 S.W.3d 621, 628 (Tex. Crim. App. 2019); *Hernandez*, 2018 WL 1528440, at *4; *see also* TEX. CODE CRIM. PROC. ANN. arts. 14.01-14.04. However, non-compliance with these requirements is exclusively a matter of state statutory law and does not constitute a federal-constitutional violation. *See Maixner v. State*, 753 S.W.2d 151, 157 (Tex. Crim. App. 1988); *Self v. State*, 709 S.W.2d 662, 665 (Tex. Crim. App. 1986).

Probable cause for a warrantless arrest exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an offense. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). An accomplice's statement against their own penal interest that implicates another person as having committed a crime is inherently

21

credible and may be sufficient by itself to establish probable cause for an arrest of that other person. *See Chavez v. State*, No. 01-07-00563-CR, 2008 WL 5263404, at *2-3 (Tex. App. – Houston [1st Dist.] Dec. 18, 2008, no pet.) (mem. op., not designated for publication); *Cornealius v. State*, 870 S.W.2d 169, 171-72 (Tex. App. – Houston [14th Dist.] 1994), *aff'd*, 900 S.W.2d 731 (Tex. Crim. App. 1995).

<em>An Initial Inquiry: Was there Probable Cause to Arrest?</em>

In making the initial determination of whether Detectives Lara and Parsons had probable cause to arrest Martinez, our analysis rests on the two pieces of evidence the detectives had in their possession at the time Martinez was arrested and placed in the holding cell: (1) the statement from accomplice Rico; and (2) the statement from witness Robles. As Rico gave a statement, the contents of his statement could supply the probable cause for Martinez's arrest if it showed that Rico was an accomplice, was making a statement against his own penal interest, and was making a statement that implicated Martinez. *See Chavez*, 2008 WL 5263404, at *2-3; *Cornealius*, 870 S.W.2d at 171-72.

Looking at Rico's statement, Detective Lara testified that it corroborated the one eventually obtained from Martinez and that it implicated Martinez "in almost the same fashion that [Martinez] told us in his statement." As Rico's statement mirrored the one eventually made by Martinez, we look to the contents of Martinez's statement to determine what facts the detectives possessed at the time they arrested Martinez. In that statement, Martinez admitted that he set up the meeting with Mina and that he, Rico, and Andrade agreed that they would rob Mina by, at the very least, physically assaulting him. Andrade had told Martinez that he was going to hit Mina with something or stab him, and Martinez noticed that Andrade "saw the bat . . . on the floor and shit

22

and he grabbed it." After hearing a thud, Martinez saw Mina knocked out cold and lying on the ground, and the other two accomplices then put Mina in the trunk. Martinez also described steps that he, Rico, and Andrade took after the robbery to conceal evidence of what they did, such as changing clothes at Robles's home, burning what appeared to be clothes, discussing the need to get rid of the aluminum bat, and tearing plastic from Rico's car to avoid being "on the radar of the cops." Based on this description of the offense given by Martinez that recited the commission of Mina's murder "in almost the same fashion" as Rico's statement, we hold that Rico's statement was one made by an accomplice against his own interest that implicated Martinez in the crime against Mina and that it could be considered, along with other evidence, in determining whether probable cause existed to arrest Martinez. *See Chavez*, 2008 WL 5263404, at *2-3; *Cornealius*, 870 S.W.2d at 171-72.

Furthermore, turning to Robles' statement, Robles told Detective Parsons that Andrade had admitted his involvement in Mina's murder, and this admission by Andrade to Robles was corroborated by Martinez's statement. Detective Lara also testified that his investigation up to the point that he met Martinez led him to conclude that Martinez had been a party to the commission of Mina's murder.

Although the investigation was still ongoing, the information that the detectives possessed from the combined statements, which was coupled with their own investigation, provided probable cause to arrest Martinez for, at the very least, robbery or even the eventually-charged offense of capital murder at the time the detectives placed him in the holding cell. *See Beck*, 379 U.S. at 91; *Amador*, 275 S.W.3d at 878 (defining probable cause as reasonably trustworthy information sufficient to warrant a prudent person in believing that the person arrested had committed an

23

offense); *see also Cornealius*, 870 S.W.2d at 172 (holding that the arresting officer had probable cause to arrest the defendant where two accomplices gave statements inculpating both themselves and the defendant in a robbery that was committed on four victims and that resulted in three deaths).

Martinez argues that Rico's statement to police could not have provided sufficient probable cause to arrest him because it was accomplice-witness testimony that required corroboration from another source. Martinez cites *Zamora v. State* for the proposition that the plain language of the accomplice-witness statute in article 38.14 of the Code of Criminal Procedure "reflects legislative determination that accomplice testimony must be viewed with caution because accomplices often have incentives to lie to avoid punishment or shift blame." *See Zamora v. State*, 411 S.W.3d 504, 513-14 (Tex. Crim. App. 2013). But as noted by the State, the plain language of the statute also expressly states that it applies to evidence relied upon to secure a "conviction." TEX. CODE CRIM. PROC. ANN. art. 38.14. Furthermore, guidance from the U.S. Supreme Court has made clear that the issue of a defendant's guilt is distinct from the issue of probable cause and that the probable-cause showing does not employ the litany of adversarial safeguards employed in a trial of a criminal offense. *See DeFillippo*, 443 U.S. at 36 ("We have made clear that the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest."); *Gerstein v. Pugh*, 420 U.S. 103, 120-21 (1975) (observing that the "adversary safeguards" used in deciding guilt in a criminal case "are not essential for the probable cause determination required by the Fourth Amendment"); *Brinegar v. U.S.*, 338 U.S. 160, 172-73 (1949) (recognizing the "difference between [what] is required to prove guilt in a criminal case and what is required to show probable cause for arrest" and the "large difference between the two

24

things to be proved, as well as between the tribunals which determine them, and therefore a like difference in the quanta and modes of proof required to establish them").

Martinez also points to the lack of any admission on his part to involvement in the assault that resulted in Mina's death as a controlling factor of our analysis. But under section 7.02(b) of the Penal Code, all conspirators engaged in an attempt to commit one felony are criminally responsible for a separate felony actually committed by one of the conspirators, even though none of the conspirators had any intent to commit it, if the separate felony was: (1) committed in furtherance of the unlawful purpose; and (2) one that should have been anticipated as a result of the carrying out of the conspiracy to attempt the initial felony. TEX. PENAL CODE ANN. § 7.02(b). Therefore, if the evidence demonstrates that a defendant conspired to commit robbery and, during the robbery, one of the co-conspirators commits capital murder, the defendant can be held criminally responsible for capital murder if it was in furtherance of the conspiracy's unlawful purpose and should have been anticipated. *Pollard v. State*, 392 S.W.3d 785, 801 (Tex. App. – Waco 2012, pet. ref'd); *see also Jacques v. State*, No. 08-02-00491-CR, 2004 WL 1801202, at \*7 (Tex. App. – El Paso Aug. 12, 2004, pet. ref'd) (not designated for publication).

The facts provided to police through Rico's statement, corroborating and reciting details "in almost the same fashion" as Martinez's statement, show that Martinez was a co-conspirator under section 7.02(b) of the Penal Code. Martinez, Andrade, and Rico agreed to rob Mina, and they all acknowledged that Andrade was going to assault Mina to accomplish it. Despite Martinez's difference of opinion on how the assault should have been carried out, Andrade told Martinez that he was going to hit Mina with something or stab him. And although Martinez at one point denied seeing Andrade holding the aluminum bat, Martinez stated, "I guess he saw the bat

25

like on the floor and shit and he grabbed it." Even though Martinez checked Mina's pulse when he saw Mina knocked out cold and lying on the ground, he simply went back inside Rico's car. Afterwards, the three accomplices engaged in various acts to conceal evidence of what they did. The circumstances here show that Martinez could be held liable for the capital murder of Mina that resulted from the agreed-upon robbery. *See Jacques*, 2004 WL 1801202, at \*7 (holding that the evidence was sufficient for the jury to find that the defendant was guilty of capital murder under a conspiracy theory where: (1) the defendant entered into an agreement with a co-conspirator to rob the victim; (2) the co-conspirator's actions were committed in furtherance of the robbery; and (3) the defendant knew the co-conspirator carried a gun); *see also Hanson v. State*, 55 S.W.3d 681, 691-92 (Tex. App. – Austin 2001, pet. ref'd) (holding that the evidence was legally sufficient to sustain the defendant's conviction for capital murder as a co-conspirator because he knew about the plan to rob the victim by hitting him over the head, the weapon was carried to the robbery in the defendant's knapsack, and the defendant retrieved the weapon after the murder).

In sum, we resolve this initial inquiry under the fourth attenuation factor in favor of the State holding that Martinez's arrest by Detectives Lara and Parsons met the constitutional standard, given it was supported by probable cause, but, even so, it violated Texas' statutory law. *See Maixner*, 753 S.W.2d at 157; *Self*, 709 S.W.2d at 665. Under these circumstances, we are faced with a situation involving comparatively less serious misconduct. *See Monge*, 315 S.W.3d at 42; *Renfro*, 958 S.W.2d at 886. And we now turn to reviewing the remainder of facts under this fourth factor through a comparatively lesser level of scrutiny given the lack of constitutional violation.

*Was the Official Misconduct Flagrant in Light of the Statutory-only Violation?*

Martinez's interaction with police began when plain-clothes officers in a regular, unmarked

26

car brought Martinez to the police office. Martinez was not handcuffed and was allowed to sit in a family area with a television that was separate from the interview room. When Martinez later requested an attorney, Detectives Lara and Parsons ceased their questioning in respect of Martinez's right to not speak to them without an attorney being present. Both detectives explained at the suppression hearing that they believed their arrest of Martinez was proper based on the evidence they obtained from speaking to other witnesses. Nevertheless, both detectives then began preparing a complaint affidavit to secure an arrest warrant. Detective Lara explained that he had not yet had the opportunity to escort Martinez to a magistrate to have an attorney appointed for him when Martinez himself flagged him down. Detective Lara also explained that he was unaware of any policies of his department that required him to immediately locate an attorney for a suspect who has requested one. Most importantly, both detectives testified that they did not use any coercion, promises, or denial of basic amenities to procure Martinez's statement. Based on the absence of flagrant or bad-faith conduct, combined with a statutory-only violation of Martinez's rights, we hold that this fourth factor weighs in the State's favor, as well. *See Monge*, 315 S.W.3d at 42-43 (holding that this fourth factor weighed in the State's favor in the absence of flagrantly abusive police misconduct where the detectives had probable cause to arrest the defendant, where the detective in charge testified that he chose not to procure a warrant based on his misunderstanding of article 14.03(a)(6) of the Code of Criminal Procedure, where the defendant went to the police station voluntarily, where the defendant was not held for an extraordinary or coercive length of time, where the detectives were civil and non-coercive while the defendant was at the station, and where the detectives gave the defendant a ride to the station and provided him with several gratuitous amenities while he was there); *Crutsinger*, 206 S.W.3d at 611 (holding that

this fourth factor weighed in the State's favor where the police arguably had enough information to get a warrant based upon probable cause and where, even though an officer improperly arrested the defendant, the officer thought the arrest was correct under the circumstances).

*The Balance of Brown Factors*

Three of the four attenuation-of-taint factors weigh in the State's favor here. Furthermore, the only factor weighing in Martinez's favor, the temporal proximity factor, is generally not a strong determining factor. *Monge*, 315 S.W.3d at 41. After balancing all factors, we hold that the State met its burden of proving that the evidence obtained from Martinez's second videotaped statement was sufficiently attenuated from the unlawful arrest. *See id*. at 40-43. We overrule Martinez's second issue presented for review, as well.

**CONCLUSION**

The trial court's judgment is affirmed.


GINA M. PALAFOX, Justice

October 31, 2019

Before Alley, C.J., Rodriguez, and Palafox, JJ.

(Publish)

28